J-S10013-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.D.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.E.W. | : | No. 1612 MDA 2019 |

Appeal from the Order Entered September 6, 2019
In the Court of Common Pleas of Lycoming County
Civil Division at No(s): FC-2013-0021022-DC

BEFORE: PANELLA, P.J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.: **FILED: MAY 11, 2020**

M.D.W. ("Father") appeals from the order entered in the Court of Common Pleas of Lycoming County, which awarded Father and M.E.W. ("Mother") shared legal custody of the parties' son, M.W. ("Child"), Mother primary physical custody, and Father partial physical custody. We affirm.

Mother and Father divorced in December 2013. Prior to the custody order on appeal, the parties' custody of their two children, their daughter, A.W.,[1] born in August 2002, and Child, born in March 2005, was governed by an agreed custody order dated August 8, 2016. *See* Order, 8/8/16. The order permitted Mother to relocate with the children from Pennsylvania to Montclair, New Jersey, and required Child to attend a private school there ("the School"). *See id.* at 1-2.

---

[1] Neither Father nor Mother raises any issue with regard to the legal or physical custody of A.W.

During the school year, the order provided Father with physical custody of Child every other weekend from Friday at 5:00 p.m. through Sunday at 5:00 p.m., as well as six days of custodial time in Montclair, New Jersey. *See id.* at 2-3. During summer, the order provided that Child would primarily reside with Father, while granting Mother physical custody of Child for two full weeks and three weekends. *See id.* The order also set forth a holiday schedule and provided Father and Mother with shared legal custody of Child. *See id.* at 1-4.

On January 22, 2018, Mother filed a petition for modification of custody, asserting that it would be in Child's best interest to equally divide Child's school breaks between Mother and Father. By order entered May 15, 2018, the trial court appointed Attorney Patricia Shipman to serve as Child's guardian *ad litem*.

After several hearings, the trial court entered its custody order, awarding the parties shared legal custody, Mother primary physical custody, and Father partial physical custody. *See* Order, 9/6/19, at 1-2. The order required Child to continue attending the School, and granted Father two weekends of physical custody per month during the school year, with one weekend per month in Williamsport, Pennsylvania, and one in the Montclair, New Jersey, area, so Child would "be able to participate in activities with his peers." *See id.* at 2. During summer, the order granted Father primary physical custody, subject to Mother's two weeks of partial physical custody, and permitted either parent to unilaterally enroll Child in camps or similar

activities. *See id.* at 2-3. Moreover, the order required Child to be enrolled in counseling and afforded Mother the right to select the counselor and to give Father notice of the selection. *See id.* at 5.

Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On appeal, Father raises the following issues for our review:

1. Did the trial court err in not granting Appellant primary physical custody of the minor child when the evidence and application of the custody factors warranted the change in custody and school district?

2. Did the trial court err in ordering in unclear and ambiguous terms that Appellant is to exercise one weekend per month in Williamsport, PA and one weekend per month in Montclair, NJ?

3. Did the trial court err in allowing the child to attend any and all camps over the summer so long as he has one parent's consent rather than requiring agreement by both parties as is set forth in the legal custody provisions of the custody order?

4. Did the trial court err in permitting Appellee to unilaterally choose a counselor for the minor child which is contrary to the legal custody provisions set forth in the custody order?

Father's Brief at 5-6.

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A. § 5321-5340, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we

- 3 -

are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

We have stated:

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (*quoting Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In *M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we stated the following regarding an abuse of discretion standard.

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*Id.* at 18-19 (quotation and citations omitted).

Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. *See* 23 Pa.C.S.A. § 5338. Section 5328(a) sets forth the best interest factors that the

trial court must consider. *See E.D. v. M.P.*, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011). Trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

Although the court is required to give "weighted consideration to those factors which affect the safety of the child" pursuant to 23 Pa.C.S.A. § 5328(a), we have acknowledged that the amount of weight a court gives any one factor is almost entirely discretionary. *M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013). Moreover, "[i]t is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case." *Id.* (citing *A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010)).

Section 5328(a) of the Act provides a non-exclusive list of factors that a court should consider when evaluating custody:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328.

This Court has explained that while the explicit desires of the child are not controlling,

> such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

**Ketterer v. Seifert**, **supra** (internal quotations and citations omitted). "The significance placed on the preference of the child who is at the center of the custody dispute is similarly within the discretion of the trial judge." **Masser v. Miller**, 913 A.2d 912, 920 (Pa. Super. 2006). Ultimately, "[w]hen a trial court orders a form of custody, the best interest of the child is paramount." **S.W.D. v. S.A.R.**, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted).

Initially, Father argues that the trial court erred by failing to award him primary physical custody of Child during the school year. **See** Father's Brief at 14. In particular, Father faults the trial court's analysis of custody best interest factors one (encouraging contact with other parent), four (stability), seven (Child's preference), nine (emotional needs), and ten (daily needs).

With respect to factor one, Father argues that the trial court erred in concluding this factor was neutral because he encouraged Child's contact with Mother and accommodated Mother's requests for schedule changes. **See id.** at 19-20. Father argues that Mother has not reciprocated. **See id.** at 20-21.

Accordingly, Father asserts that factor one should have favored him. *See id.* With respect to factor four, Father contends that this factor should have favored him rather than Mother because of his long-term ties to his community, and Mother's various residences and her plan to move to Florida. *See id.* at 21-24. Further, Father relies on the quality of his local school system as compared to the School. *See id.* at 24-25. Moreover, Father faults the trial court's focus on Child's education in its analysis. *See id.* at 26-27.

With respect to factor seven, Father argues the trial court improperly disregarded Child's preference to move to Montoursville, Pennsylvania. *See id.* at 27-30. Regarding factor nine, Father contends the trial court erred by focusing on his decision to delay his wedding to his fiancée, K.G. *See id.* at 30-31. Additionally, Father argues that the testimony of Child and the GAL establish that this factor should be equal or favor Father. *See id.* at 30-31. With regard to factor ten, Father asserts the trial court should have concluded this factor was equal rather than "slightly favoring" Mother because Father meets Child's educational needs and cares for Child. *See id.* at 31-32.

At the conclusion of the August 23, 2019, hearing, the trial court announced its evaluation of the custody best interest factors on-the-record. As pertinent to Father's appeal, the court stated,

> THE COURT: Let me say a couple things, generally, here. First of all, I want to commend each of you, [A]ttorney Dinges and [A]ttorney Protasio, for, as always, your performances. You both are very, very skilled, experienced family law practitioners. Your clients are very fortunate to have each of you as attorneys and I love having you be in court because you do thorough jobs and

- 8 -

save the [c]ourt a lot of work and I appreciate that very much. There are lots of attorneys who practice family law who don't know what they are doing so I commend you for that.

I also commend Tricia Shipman for one of the most thorough GAL reports I've ever seen and I can't imagine how much time she spent with the children in this case and I really can't think of a situation down in my home district where we've had that kind of comprehensive GAL report. She did a thorough job so I'm grateful for that.

One other comment. I'm very sorry we did not have the participation of [A.W.;] I think it leaves a hole in the information that the [c]ourt should have. But since all of you are in the position that she should not be disturbed, I'm not going to subpoena the child to come in here against her will that has to be. I think there's some unanswered questions that only she could have answered.

I'll tell you what the driver is here and I'll go through the custody factors. The driver to me is the educational piece and I really responded to what [A]ttorney Dinges said about, you know, trying something that could be an experiment.

We know for a fact -- and I'll go through the factors -- we know for a fact that the child has been with mom since 2016, living with mom in New Jersey with her being the primary caretaker during that very important part of the time of the year where the child is in school.

We also know an awful lot about [the School] and I want to say this, I think the information on the Montoursville High School is very impressive. It's -- I think it's a superb school from the things I've heard and seen in the testimony but I think for this child the continuation at [the School] is very important and I'll tell you why I say that when I get to that factor.

So what's going to happen here is nothing is changing other than, perhaps, tweaking a bit on the periods of physical custody. One thing I didn't tell you was that --and I think this is true -- that [Child] said that he was not concerned about coordinating times with [A.W.] for visits to family. He felt that [A.W.] was agile enough, my word, to work things out so that she could be with [Child] when they wanted to be together and he also pointed out that she's going to be an adult in the not so distant future, two years from now, and she'll be able to implement whatever she wants in terms of spending time with [Child].

- 9 -

Let me go down through the custody factors as I see them.

Factor 1 – [] I will ask the Court Reporter to make a transcript[] of this which I'll attach to my findings -- which party is more likely to encourage and permit frequent and continuing contact between the child and the other party. I don't see that as a problem. I agree with the Guardian Ad Litem on that.

***

Continuing on with the parental duties, factor 3 -- excuse me[,] let's go to factor 4, the need for stability and continuity in the child's education, family life and community life. We know that [Child] has been with [M]other for the past several years so that continuing his residence with [M]other during the school year does continue the stability and continuity in his education, family life and community life.

We grant that [Child] is very familiar with life in Williamsport; he lived here for a period of time, he has friends here. I don't see that anything we're going to do is going to prevent him from continuing with those friendships.

This is -- the problem with doing a custody case like this is that you're making a decision, although I think the education piece is a big factor, in all other respects when you weigh these factors and favor against one parent or the other, sometimes you're dealing with just a hair line [sic] difference that really doesn't amount to anything.

I just note that we talk about stability and continuity, there was testimony from [Father] and [K.G.], they have been together for two years, they have been in a -- living together for two years, they've been in a relationship for four years. I don't know what to make of the fact that there was this -- what's the word I want, failed or canceled -- we'll call it a canceled marriage plan and that nothing further has happened with that. I mean, it's undeniable that [Mother] is remarried and it would appear to me is in a very successful marriage. Again, this is just a minor factor but it is a difference between the two families, not something that really tips it either way for me but I do note that it was a difference.

***

Number 7, well-reasoned preference of the child based on the child's maturity and judgment. We do note that this is one of

- 10 -

17 factors, we had a point when if [Child] had said something different from what he said today at the day we first -- the day we first got together,[2] I don't know what the outcome would have been, whether the parties would have made an agreement to shift the custody, but turns out that that was not truly [] what he wanted. He wanted to be in the Montoursville High School. I don't feel that his reasons for doing that are based on sound educational needs and I'll talk more about that when I talk about [the School]. Class size, that is just one thing. So, his preference is recognized, I think he spoke honestly about it, but as I noted to you, it was not about which parent he wanted to live with or what school he wanted to go to.

***

Number 9, which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional and physical needs. I agree with the GAL on this and I think [Child] has demonstrated in his statement to me he'd be fine living either place. He has -- and that, to me, is a great credit to the parents who made him feel comfortable.

Again, I am getting into these tiny little micro factors. I'm just -- I'm curious about why [Father] and [K.G.] have not solemnized their relationship. [Mother] is apparently successfully married and has a relationship with [Stepfather, J.O.,] which is locked in by virtue of the marriage contract.

Number 10, which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. Mom has a track record on this because she's got the primary custody.

One thing that's curious to me, and I think Miss Protasio indicated, I don't know why the parents aren't coming through better with monitoring the homework piece. How do you not know that a child has or hasn't done homework?  Show me what you did and look up what the assignment is on the web page and you make a match and you ride hard. I don't think that [Father's]

---

[2] The trial court spoke with Child off-the-record before the start of the first hearing. The court reported to the parties that Child indicated his educational needs were best met by attending the School, while his social needs would be best met by living in Williamsport. *See* N.T., 7/22/19, at 5.

statement that he takes [Child's] word for it when he says he has no homework is the way to go. My goodness, I would never take a child's word for that. I would make sure the child show[ed] me that that wasn't true or I'd investigate it myself.

So both parents need to, I think, step up more on this homework question. Again, when I talk about [the School] I'll flush that out. So, mom has the greater opportunities to do something with this and I can say why is the child not doing better, I'm talking about that now. So I'll give mother a vote on that one in her favor slightly and also give her a vote on factor 4 about stability.

\*\*\*

And, of course, the recommendation of [the] Guardian Ad Litem was that the child stay where he is and continue at [the School]. And Miss Shipman, after interviewing the child, said that I could report to you -- and she's now back in the courtroom -- and her recommendation has not changed. To me it's all about the educational piece and I reread – I reread the grades, I reread the emails between the teachers and the parents and the level of concern and interest on the part of [the School] in all dimensions of [Child's] persona is impressive to me. And if this child is going to be successful educationally, it's going to happen at a school like [the School].

Why is he not doing better?  Once upon a time he did okay. I think that definitely this custody case is wearing on his attention span, on his ability to focus, he said that to me although he tried to blend in some family losses and I can understand that. But I do think if there's a recipe for success it's going to be with [the School].

One thing I noted was that the lowest final grade he got was a C minus. Under the scoring system given by [the School], and we like to have him get all A's and in the past he's seen that, that's still a satisfactory grade under the criteria of [the School]. He has only one C minus which is in algebra.

Several teachers said he needs to reach out for help. There are lots of suggestions from teachers about how he can improve and the parents need to be right on top of that at all times.

I already commented about the fact that the homework is not getting done, assignments are not getting turned in. Just as

an example, the algebra teacher said it's important for him to seek help. English teacher, same thing. The history teacher said that he has difficulty in completing assignments. Science teacher, less successful in completing assignments. Spanish talks about needing to practice grammar, review class notes. I would think that's something that [Mother] and [Father] could well inquire into. I don't know if either of them speaks Spanish but doing drills and making him do drills I think apparently is something that needs to happen.

The media arts teacher said [his] project was late again so this business about not turning things in, not getting work done, I don't see why that can't be fixed by the parents and you can't take [Child's] word for it, you've got to be on top of it. I just don't see that a switch of the schools is going to solve the problems. He can still turn things in late and not complete things and not do homework and my concern is that while Montoursville certainly is a great school, I don't want [to] play games and take a chance on something that hasn't been tested yet.

And he said – [Child] said he'll be perfectly happy if I say that he stays at [the School] and that's what I'm going to do. I don't want to tamper with what has a better, I think, opportunity for his success given that this is where he's been, this is what we know. He's never been in public school before and as good as Montoursville might be, I just I don't have the confidence that [Child] will be able to take charge of things in the way that he tries to tell me he can.

So, what's going to happen is this, the existing -- we're short on time -- existing custody order of 2016 will remain in effect. I'll tinker with it a bit to try to improve some of the things and I'll add a counseling requirement. In the final order I'll also -- I thought about ordering a provision for parental counseling. I'll be thinking about that. I think that's hard to implement given how far away the parties are from each other but they possibly could do something individually. We'll see about that. So that's where we are. [Child's] school begins the day after Labor Day and that's where he's going to be. And we'll issue an order not right away because I am away for most of next week but we'll get an order out to that effect.

N.T., 8/23/19, at 182-197.

The record supports the trial court's conclusions and analysis. Mother testified at length regarding her belief that it would be preferable to have Father exercise one weekend of his physical custody time each month during the school year in Montclair, New Jersey. *See* N.T., 7/22/19, at 14. Mother asserted that by exercising custody in New Jersey, Child could participate in activities with his peers. *See id.* at 15-16. Mother thought this was workable, particularly because Father owns an airplane and flew back and forth previously. *See id.* at 14-15. Mother testified that it took less than three hours to drive from Williamsport to Montclair, and under one hour to fly. *See id.*

Mother claimed that Child was frustrated with the current custody arrangement because he missed out on activities with his friends in Montclair. *See id.* at 70. Mother explained that the goal of the proposed schedule was to have Child travel less and "make the schedule about the child not the parent, to integrate the parent into the child's lifestyle and to introduce the parent into the peer group of the kid and not make it about the parent, make it about the kid." *See id.* at 40. Mother believed the schedule would allow Father to be more involved with Child's life in New Jersey.[3] *See id.* at 15-16. Although Father asserted that Mother spent most of her weekends away from

_____

[3] While Mother lives in New Jersey during the school year, she is a Pennsylvania resident as she resides at a Pennsylvania address 184 days per year. *See* N.T., 7/22/19, at 32-33. Mother's husband testified that he and Mother eventually planned to buy a house in Florida. *See* N.T., 7/23/19, at 285-86.

New Jersey, Mother testified that she is home in New Jersey for approximately half of her weekends with Child. *See* N.T., 8/23/19, at 10-11. Further, Mother asserted that Child is involved in activities at school and has a good group of friends. *See id.* at 12-13, 34-35.

With respect to summer, Mother testified that Child should attend a three-week theater camp and Father and Mother should split the remaining time so that Child could spend time with his friends in New Jersey. *See* N.T., 7/22/19, at 16-17. While Mother asserted that she and Father should decide on camp and divide the remaining time together, she did not believe that they had a good enough relationship to accomplish that. *See id.* at 18. Accordingly, Mother testified that she wanted either parent to be able to sign Child up for camp, but explained that her intent was not to be punitive by, for example, having one parent sign Child up for 12 weeks of camp. *See id.* at 43-44.

Mother opined that Child should continue to attend the School. *See id.* at 26. Mother further testified that Child attended private school starting in first grade, and that the School provided a small class size. *See id.* at 28-29. Mother expressed concerns that Montoursville Area High School had a student to teacher ratio of 28-1.[4] *See id.* at 45-46. Mother believed the personal

_____

[4] Alyson Waldman, the director of admissions and financial aid at THE SCHOOL, testified that the School has a challenging, engaging, and innovative academic program that stresses personal responsibility. *See* N.T., 7/23/19, at 84-87. Daniel Taormina, the principal of Montoursville Area High School, testified that the student to teacher ratio is 15 to 1 and that the school offers

attention at the School was important because Child is easily distracted. ***See id.*** at 28-30. Further, Mother testified that Child needed to attend counseling to develop "self advocacy skills." ***See id.*** at 23.

Father testified that he believed that it was in Child's best interests to stay with Mother in New Jersey until Child told the GAL that he wanted to live with Father. ***See id.*** at 122; N.T., 7/23/19, at 60-61. Father testified that Child's grades declined throughout the year for the sixth and seventh grades. ***See*** N.T., 7/23/19, at 52-54. Father also expressed concerns that Child does not do homework while living with Mother. ***See id.*** at 13-15. Father asserted that Mother did not do enough to get Child to do his homework, although he acknowledged that both parties could do a better job about punishing Child for not performing schoolwork. ***See id.*** at 93-98. With respect to the parties' ability to work together in general, Father acknowledged there are times when they do not get along, but he believed they cooperated better than was being portrayed. ***See*** N.T., 7/22/19, at 116-17.

After Child expressed a desire to move, Father took Child on a tour of Montoursville Area High School, which Father described as a public school offering a high caliber education. ***See*** N.T., 7/23/19, at 6-13. Father believed that Child's schooling issues at the School were related to his lack of

---

a number of advanced placement classes and elective opportunities, including the opportunity to attend classes at local colleges. ***See id.*** at 180-82.

accountability, and asserted that Child could successfully transition to public school. *See id.* at 14-15, 20-21. Father noted that Child's transition would be aided by his numerous friends in Montoursville. *See id.* at 28-29.

With respect to Mother's contention that Father should travel to New Jersey to exercise custody, Father observed that Mother travels to Pennsylvania for the vast majority of her custodial weekends, so Child generally does not participate in activities in New Jersey. *See id.* at 26-28. Based on Father's calculation of the time Mother spent traveling, Father noted that if he traveled to Montclair for nine weekends a year, he would spend twice as many weekends a year in Montclair with Child compared to Mother. *See id.* at 27-28. Father asserted that, under the current schedule, Child did not miss any activities with friends in New Jersey because Father and Mother generally swapped weekends. *See* N.T., 7/22/19, at 104-05. Although Father did not object to occasionally travelling to New Jersey, he did not want the order to require him to do so one weekend per month because Child might wish to travel back to Williamsport to see his friends. *See id.* at 108-10.

Father testified that after Mother gave him a list of potential counselors for Child, Father took several weeks to contact them. *See* N.T., 7/23/19, 72-3. This delay prompted a follow-up e-mail from Mother threatening to unilaterally pick the counselor. *See id.* at 74. Father explained that he eventually contacted the counselors and none would agree to counsel Child. *See* N.T., 7/22/19, at 119-20. Father asserted that he was not against Child

attending counseling, but claimed that he requested that the parties agree that the counselor would not become involved in the litigation. *See id.* at 118-19.

With respect to camp, Father believed that both parents should be required to agree before signing Child up for a camp, explaining his position as follows:

> I think we need to try to work it out. That's just life. I just think, though, the default of only one parent needs to have approval is an absolute recipe for disaster for that child approaching the parent who he thinks he will get the correct answer from, he or she.

*Id.* at 101. However, Father also testified that he unilaterally signed Child up for a gaming camp because it occurred during his custodial time. *See* N.T., 7/23/19, at 155-56.

Father further testified regarding his relationship with K.G., asserting that he and K.G. were going to marry on December 31, 2017, but decided not to move forward at that time. *See id.* at 107-08. While Father and K.G. were still engaged, Father explained that they decided to call a "time out" with respect to scheduling the ceremony. *See id.* at 108. Father acknowledged that K.G.'s daughter moved in with her grandmother at about the same time that he and K.G. decided not to get married, but suggested that the issues were not related. *See id.* at 108-12. Further, Father conceded that K.G. previously attended an alcohol rehabilitation program, and that she still drinks. *See id.*

Patricia Shipman, the GAL, expressed concerns about Child's ability to take responsibility for his education and testified that she believed that it served Child's best interests to attend the School because of the amount of oversight. *See id.* at 197-98. Attorney Shipman believed that Child's stability in education weighed in favor of Mother. *See id.* at 219-20. Further, Attorney Shipman testified that Father should not be required to go to New Jersey every other weekend, asserting that it was more important for Child to inform Father about his activities and for Father to accommodate them. *See id.* at 205-06. Attorney Shipman questioned whether Child actually missed activities in New Jersey while he was at Father's house because Mother spent significant time during the weekends outside of New Jersey. *See id.* at 208-09. Overall, Attorney Shipman opined that Child's social life was in Williamsport, but that it was more important for Child to attend the School. *See id.* at 206.

Child testified *in camera*, acknowledging that while he had previously been neutral about where he wanted to live, he now wished to live with Father during the school year. *See* N.T., 8/23/19, at 120-21. Child disclosed that he initially favored staying at the School because he was concerned about the potential to have 28 students in a class at Montoursville Area High School. *See id.* at 121-22. However, he had visited the school and did not believe that the rooms would hold that many students. *See id.* Accordingly, Child no longer believed there was a difference between the two schools. *See id.* at 122. Child acknowledged he did not know much about Montoursville Area High School

beyond the class size, but highlighted his interest in theater and Montoursville's strong theater program. *See id.* at 124-25.

Child further testified that he did well at the School and had friends, but did not see them outside of school. *See id.* at 126. Child asserted that he had more friends and connections to Williamsport and would have more opportunities to spend time with friends in Williamsport. *See id.* at 126-27, 135-36. However, Child stated that he would be able to adjust if he stayed in New Jersey. *See id.* at 140-41.

While Father argues that the court erred in its evaluation of the custody best interest factors in awarding Mother primary physical custody during Child's school year, our review of the record confirms that the trial court did not abuse its discretion in its evaluation of the testimony and weighing of the factors. Moreover, although Child testified that he wished to live with Father, Child's position changed throughout the litigation, and the trial court appropriately explained its rationale for discounting Child's preference. Accordingly, Father's first issue does not merit relief.

In his second issue, Father contends that the trial court's decision to require Father to exercise one weekend of his partial physical custody in Williamsport, Pennsylvania, and one weekend in Montclair, New Jersey, is improper and vague. *See* Father's Brief at 32. Father acknowledges Mother's testimony that Child's time away from New Jersey for two weekends per month impaired Child's ability to participate in community and peer activities.

*See id.* However, Father argues that, to the extent he travels to New Jersey, he is unlikely to be able to participate in Child's activities, and that both Father and the GAL believed such a provision would be unworkable. *See id.* at 32-33. Moreover, Father asserts that the requirement that his custody time occur in Williamsport is vague and unworkable. *See id.* at 33-34. Father notes that he lives in Montoursville rather than Williamsport, and that, accordingly, he would be required to locate a hotel in Williamsport to comply with the order. *See id.* at 34.

Additionally, Father contends that, on weekends when Child does not have activities, the order does not explicitly allow him to exercise custody in Pennsylvania. *See id.* As structured, Father contends the order deprives Child of the ability to see his friends and extended family. *See id.* at 34-35. Further, Father contends that the logistics of traveling to New Jersey make exercising his custody time difficult and punishes Father for historically being accommodating to Mother. *See id.* at 35-36. Father argues that it would be preferable for the parent with partial physical custody to have custody every other weekend at the location of their choice. *See id.* at 36-37. Moreover, Father observes that he previously had physical custody every other weekend rather than twice per month, and that the order does not specify which weekends Father has custody. *See id.* at 34-37.

Initially, we note that in Father's Rule 1925(b) statement, he did not specifically assert that the trial court erred by requiring him to exercise one of

his weekends of custody within the City of Williamsport, focusing instead on the difficulties of traveling to New Jersey.[5]  Accordingly, that issue is waived. *See Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 797 (Pa. Super. 2006) (citations omitted) (stating, "any issue not raised in a statement of matters complained of on appeal is deemed waived."). Moreover, even if Father had not waived this specific issue, it is apparent that the trial court's reference to "Williamsport" refers to the general area where Father lives. *See* Order, 9/6/19, at 2 ("Father shall have partial physical custody of [Child] one (1) weekend per month in Williamsport, PA, and one (1) weekend per month in the Montclair, N.J. area in order for [Child] to be able to participate in activities with his peers."). While the language of the order could be more precise, we do not find merit to Father's argument that the custody order requires Father to exercise his custodial time solely within the geographic bounds of the City of Williamsport. Accordingly, we reject Father's assertion that the trial court's order improperly limits the location of Father's custodial time to the City of Williamsport.

_____

[5] Father's Rule 1925(b) statement included the following: "[i]n ordering in unclear and ambiguous terms that Appellant is to exercise one weekend per month in Williamsport, PA and one weekend per month in Montclair, NJ when clearly restricting the child's custodial time with Appellant is not in M.W.'s best interests and does not take into account the impracticality, expense and Appellant's ability to travel out of state each month. Moreover, the provision does not accomplish the goal for which it was intended and as such was an abuse of discretion by the trial court."  Rule 1925(b) Statement at ¶ 1c.

With respect to the order's requirement that Father exercise custody two weekends per month, with one weekend per month in the Montclair, New Jersey, area, we again discern no abuse of discretion. While Father's argument relies on testimony that was favorable to him, additional testimony, primarily from Mother, supported the benefits to Child for Father to travel to New Jersey to exercise his periods of physical custody one weekend per month. Further, there was testimony supporting the need to work around Child's activities. It is apparent that the trial court credited this testimony and concluded that Father should have two custodial weekends per month, with one of the custodial weekends in New Jersey to allow Child to participate in activities. *See* Order, 9/6/19, at 2. We discern no abuse of discretion in the trial court's order. Accordingly, Father's second issue fails.

In his final two issues, Father argues that the trial court erred by permitting Child to attend any and all camps over the summer if one parent agrees, and by permitting Mother to unilaterally select a counselor for Child. *See* Father's Brief at 37-39. Father argues that both provisions contradict the shared legal custody otherwise required by the custody order. ***See id.*** Moreover, Father contends that allowing one parent to unilaterally select camp will make vacation planning difficult and would, in a worst-case scenario, allow Mother to deprive Father of significant custody time over the summer by scheduling numerous camps. ***See id.*** at 37-38.

Although the trial court did not offer a specific rationale for allowing either parent to choose a camp, or for Mother to choose Child's counselor, the court acknowledged the strained relationship between Father and Mother. Further, the court stated that it "maybe, will back off from a more formal tradition of legal custody in that talking about how the parents view this which is not, as Miss Protasio pointed out, what we lawyers and judges see as legal custody, shared legal custody, but I'm afraid if I try to tinker with this it's going to create another area of discord in interactions between the parties so I'll be thinking about that." *See* N.T., 8/23/19, at 192-93.

Our review of the record confirms that there was ample testimony presented to establish that the parties were unable to communicate regarding Child's camp and counselor in a manner that advanced Child's best interests. Although the trial court awarded Father and Mother shared legal custody, it carved out these two areas that were historically problematic.

With regard to camp, Father's concerns that Mother can deny him substantial custody time over the summer are entirely speculative and are inconsistent with Mother's testimony at trial. To the extent that Mother pursues such a strategy, Father would be entitled to seek relief with the trial court. However, we do not discern any abuse of discretion or error of law with respect to the manner in which the trial court addressed camp and counseling for Child. Accordingly, we affirm the trial court's order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>05/11/2020</u>